THE TRAVELERS INSURANCE COMPANY, *et al.,* v. DELORES STORMES TAYLOR and JAMES CLARENCE TAYLOR, JR.

3 So. (2nd) 381
En Banc
Opinion Filed April 18, 1941
Rehearing Denied July 22, 1941

*Harry T. Gray, Marks, Marks, Holt, Gray & Yates,* for Appellants;

*William E. Fairbanks,* for Appellee.

THOMAS, J.—The Terminal Transfer Company operated a truck between Jacksonville, Florida, and Waycross, Georgia, as a contract carrier for The Great Atlantic & Pacific Tea Company, delivering goods to four of its stores in the latter city. James C. Taylor was employed by the carrier as a driver of the truck and had been in that service for six or seven years.

It was his duty in this employment not only to drive the truck but also take receipts for merchandise delivered and he was responsible both for the machine and its freight.

In March, 1939, on a night prior to one of the scheduled trips to Waycross, Taylor attended a dance and did not return to his home until about three o'clock the following morning. Feeling that if he went to bed he would oversleep and probably not reach his work on time he changed clothes and within an hour went to the place of business of his employer in his own car. About two hours later, his whereabouts meanwhile not being disclosed, he roused a friend, James DeLettre, from his sleep and asked him to operate the truck on the regular trip to Waycross that he, Taylor, might be able to observe DeLettre's ability to drive.

Parenthetically, it was claimant's theory that Taylor's desire to be acquainted with the qualifications of DeLettre as a driver grew out of a request made of him by the manager of the employer company to "pick somebody out" or "be on the lookout for somebody" for the position. This is the version given by the manager of the transfer company who was a brother-in-law of Taylor and whose testimony appears in the record.

To continue with the narrative of facts, when the two men reached the warehouse of The Great Atlantic & Pacific Tea Company in Jacksonville the truck was being loaded in preparation for the journey to Waycross and Taylor signed a receipt for the goods. From the starting point the truck was taken to a filling station where it was replenished with gas and Taylor signed the receipt left with the operator. He then

told DeLettre to proceed toward Waycross and to wait for him at Dinsmore, a few miles distant.

When that place was reached Taylor appeared in his own car accompanied by one Lee Williams, a "checker" for the same company that employed Taylor. The truck driver next saw the men at Hilliard and later the car occupied by Taylor and Williams passed the truck near Folkston. When the truck went by the "New York Tourist Camp" a short distance beyond Folkston Taylor's car was parked there.

Upon arriving at Waycross DeLettre delivered some of the merchandise at one of the stores of The Great Atlantic & Pacific Tea Company and proceeded to the second store where Taylor was waiting for him. Taylor took the receipt of the manager of that store for the goods delivered. Although the truck driver went to the remaining two stores of the company in Waycross, he did not see Taylor again until the driver returned to the second store visited where Taylor appeared still accompanied by Williams.

As he was preparing to leave Waycross DeLettre was told by Taylor to go to "Jim Bowie's Camp" and upon arriving there he was instructed to park the truck while the three men proceeded to "Travelers Inn," a roadside place south of Waycross; thence to Waycross. As they were leaving this inn Taylor became sleepy and his companion Williams drove the car to Waycross and back to Bowie's camp while Taylor remained asleep. Finally DeLettre left for Jacksonville and as he drove southward, past "New York Tourist Camp" just north of Folkston, he saw Taylor and Williams, the former still asleep. DeLettre told Williams that he would meet them at "Three Sisters Inn" north of Hilliard.

When he reached there he saw nothing of the other car and after waiting for about thirty minutes received the information that the car occupied by Taylor and Williams had been wrecked, and that both of them were injured. As a result of the accident both Williams and Taylor died.

DeLettre had been cautioned by Taylor during the day not to go into Jacksonville without him because it was necessary that he "do something with these tickets," evidently referring to the receipts delivered by the storekeepers to evidence the delivery of merchandise to them.

The manager of the carrier company was asked on the witness stand if he had any "idea on this day that any one else was driving the truck" and he replied in the negative.

The actions of Taylor are given in some detail because necessary to a comprehensive application of the relevant portions of the "Florida Workmen's Compensation Act."

It may be well, at the outset, to quote that section of the Florida Workmen's Compensation Act (Chapter 17481, Laws of Florida, Acts of 1935) which defines an injury for which recovery may be obtained by an employee as "personal injury or death by accident arising out of and in the course of employment . . . ." As was said in Mueller Const. Co. v. Indus. Board (Ill.) 118 N. E. 1028, these phrases are used conjunctively and it is indispensable to recovery that both of them be established by the claimant, so it was incumbent upon those seeking relief to establish that Taylor's death was the result of an accident happening not only in the course of his employment but arising out of it. If it should be conceded that he was

injured in the course of his employment because at the time of the unfortunate accident he was in the service of Terminal Transfer Company and had been for a period of several years, yet real difficulty was met when the claimants attempted to show that death was in consequence of an accident "arising out of" that employment. See also In re: McNicol's case, 215 Mass. 497, 102 N. E. 697, L. R. A., 1916A.

We said in Fidelity & Casualty Co. of New York, et al., v. Moore, 143 Fla. 103, 196 So. 495, that there must be a causal connection between the employment and the injury or that harm resulted from a risk incident to or connected with the employment.

It is plain from the facts which we have outlined that it was the duty of the employee to drive his employer's truck from one city to another and at the terminus deliver the goods transported to four different stores, taking receipts therefor. Clearly he was responsible for the proper operation of the vehicle, the merchandise he carried and the delivery to the proper consignees. On the day of the accident he purposely, and as we think, without authority secured some one else to perform those duties. Although he appeared at the starting point and intended to be in Jacksonville when the truck returned in order that he could deliver certain receipts which he held, the journey between that city and Waycross and return was made by the truck with a substitute driver. Sporadically, during the time between the departure of the truck and the accident he came in touch with the driver. Meanwhile he had made several calls at various roadside places. He was not upon the truck driving nor was he there to guard the goods which in the ordinary course of employment were entrusted to his care. As far as the

delivery was concerned he supervised at one store instead of four.

The only explanation offered for this remarkable conduct on his part was that he felt empowered to select another driver for his employer and that this was the manner which he chose to determine the fitness of the one whom he had approached about the subject. Even if he had the authority, and we must say the testimony does not establish it, the position is hardly logical.

If he wished to determine the fitness of a person to drive a truck and perform duties with which he had become familiar over a period of six or seven years, he could without question have made his observations much better by riding on the truck with the prospective driver than by traveling in his own car, much of the time asleep, and seeing the truck at intervals along the road. If he desired further to observe the manner in which the person selected by him made deliveries and intended to familiarize that person with the methods of delivery which he had been following, he would have done so at the place of each of the four consignees instead of at but one of them.

It is important to remember that the manager of the employer company knew nothing of the substitution on the date of the fatal accident and that the whole procedure was irregular when compared with the routine that the deceased had followed during his long period of service.

It is a fair deduction from the evidence that Taylor selected the means outlined for the continuance of his work on the fatal day because he was fatigued and needed rest. Harm came to him while he was riding in his own car with a friend of his choice. It may be

said that death resulted from an accident ocurring to him in the course of his employment, but it is obvious to us that while embarking on the mission in a method utterly foreign to the one expected of him by his employer he suffered injury not traceable to that employment. At the exact time of the accident Taylor was not where he should have been to fulfill the obligation he owed his employer. See Section 288 of Schneider on Workmen's Compensation law.

We are not ignoring the rule with reference to the weight which should be given to the finding of the circuit judge (Firestone, etc., v. Bullard, 141 Fla. 282, 192 So. 865) in proceedings of this nature. Fully observing this rule we have the conviction that the injury did not arise out of employment and that claimants should not, therefore, have prevailed.

The order of the circuit court confirming the findings of the commissioners is therefore reversed.

BROWN, C. J., WHITFIELD and TERRELL, J. J., concur.

BUFORD and CHAPMAN, J. J., dissent.

BUFORD, J. (dissenting).—I am of the opinion that the record shows that the injury occurred in the course of employment of claimant and that death resulted from an accident arising in the discharge of his duties to his employer because he was not only required to drive employer's truck but also to see that goods transported by the truck were properly delivered to the consignees.